**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**DONALD JAMES COTTERMAN,**

      **Plaintiff,**

**vs.**                                  **Case No. 4:14cv642-MW/CAS**

**SHERIFF CHARLIE CREEL, et al.,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff Donald James Cotterman filed this case as a pretrial detainee awaiting trial in Wakulla County, Florida.  Pending in this case is a motion for summary judgment filed by Defendant Brian Miller, ECF No. 124, the Assistant State Attorney who was prosecuting the state criminal case against Mr. Cotterman.  Also pending is a motion for summary judgment filed by Defendants Jeff Carroll, Charlie Creel, Jackie Martin, Jared Miller, and Clarence Trey Morrison, ECF No. 126, all of whom are officials at the Wakulla County Jail.

Procedurally, Mr. Miller filed a motion to dismiss, ECF No. 60, which was granted in part and denied in part.  ECF Nos. 88, 95.  Mr. Cotterman's First Amendment freedom of speech claim survived the motion to dismiss but all other claims were dismissed.[1]  The official capacity claim proceeds against Mr. Miller for injunctive relief only.  ECF No. 95.  Additionally, the Wakulla County Jail officials filed a motion to dismiss on the basis of exhaustion.  ECF No. 39.  That motion was denied.  ECF Nos. 81, 91.

**Allegations of the complaint, ECF No. 38**

Mr. Cotterman's claim against Mr. Miller, the prosecutor, was presented in count 2 of the complaint.  ECF No. 38 at 10.  He alleged that on September 11, 2014, Mr. Miller conspired with four other Defendants (Sheriff Creel, Deputy Morrison, Major Miller and Captain Martin) at the Wakulla County Jail and had them go into his confinement cell and take all his "legal material," all mail, and writing paper, and "go through it, make copies and give the copies to Prosecutor Miller."  *Id.*  He alleged that Mr. Miller ordered all of his property be placed in storage, unlawfully depriving him of his property without a warrant and reviewing confidential legal material outside his presence.  *Id.*  On September 15, 2014,

---

[1] In particular, the Fourth Amendment claim concerning the search and seizure of materials from Mr. Cotterman's cell was dismissed on qualified immunity grounds.  *See* ECF Nos. 88 at 25, 95.

Mr. Cotterman informed the judge of those actions, which Mr. Miller "admitted to," and the judge "ordered Mr. Miller to return all [his] property." *Id.* at 11.

Mr. Cotterman's claims against the Defendants at the Wakulla County Jail are as follows.  Count 1 alleges that Sheriff Creel, Major Miller, Deputy Morrison, and Captain Martin placed him in administrative segregation and took away his privileges without due process of law.  ECF No. 38 at 6-9.  In Count 3, Mr. Cotterman alleges that Deputy Carroll prevented him from receiving proper medical treatment after having a seizure.  *Id.* at 11-12.  Count 4 alleges that Deputy Carroll retaliated against Mr. Cotterman by failing to provide him an "indigent kit."  *Id.* at 12. The final claim presented in count 5 is that after the toilet in Mr. Cotterman's cell flooded, Deputy Carroll did not provide he and his cell mate with a mop bucket or cleaning supplies, forcing them "to sit in unsanitary conditions for several hours."  *Id.* at 12-13.

**Legal standards governing a motion for summary judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party must then show[2] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of evidence" is not enough to refer the matter to a jury).  The Court must

decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)). All "justifiable inferences" must be resolved in the light most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct. at 2578 (noting the distinction "between evidence of disputed facts and disputed matters of professional judgment."),[3] but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

---

[3] Noting that deference must be given "to the professional judgment of prison administrators," the Court stated that "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." Beard, 548 U.S. at 530, 126 S. Ct. at 2578 (citing Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 2167, 156 L. Ed. 2d 162 (2003)).

**The relevant Rule 56(e) evidence**

Mr. Miller submitted an affidavit declaring that he had been assigned to prosecute the State's case against Mr. Cotterman.  ECF No. 125-1 at 1. On March 11, 2016, the case was reassigned to Jon Fuchs.  *Id.*  The charges against Mr. Cotterman are: (1) burglary of a dwelling, armed with a firearm; (2) grand theft of a firearm; (3) grand theft; and (4) possession of a firearm by a convicted felon.  *Id.*  If convicted, Mr. Cotterman "will receive a mandatory life sentence under Florida law."  *Id.*  Mr. Cotterman has been held in the Wakulla County Jail since his arrest in April 2013.  *Id.*

Jury selection for Mr. Cotterman's trial took place on August 25, 2014, and his trial was scheduled to begin on August 28, 2014.  ECF No. 125-1 at 2.  On August 28th, Mr. Miller was "made aware of telephone calls[4] made by [Mr.] Cotterman in which he contacted persons outside the jail and instructed them to make contact with jurors that had been selected to hear his case and to influence them in his favor at the trial."  *Id.*  During that afternoon, "a hearing[5] was held outside the presence of the jury"

---

[4] Jail staff monitor and record "all non-privileged telephone calls made by jail inmates and pretrial detainees."  ECF No. 125-1 at 2.  Notice is provided "over the phone before each phone call is made."  *Id.*

[5] Mr. Miller's affidavit states that the transcript for the hearing was attached as exhibit 1 to the affidavit.  ECF No. 125-1 at 2.  No such exhibit was attached.

during which "recordings of two telephone calls were played evidencing an effort by [Mr.] Cotterman to contact and influence a member of the jury." *Id.* "The court was also advised of two affidavits drafted by [Mr.] Cotterman and signed by two other inmates, both containing false exculpatory testimony." *Id.* Following the hearing, Mr. Cotterman's "telephone privileges were suspended by the court and he was allowed no contact with anyone except his attorney." *Id.*

Mr. Cotterman's trial was continued until September 17, 2014. ECF No. 125-1 at 3. Sometime between September 8-11, 2014, Mr. Miller was "made aware that other inmates at the jail had contacted jail officials regarding notes sent to them by [Mr.] Cotterman. The "notes provided names and addresses of persons on [Mr.] Cotterman's jury and instructed the inmates to contact the jurors and try to influence them in an attempt to secure a mistrial which [Mr.] Cotterman believed would be equivalent to an acquittal." *Id.*

Based on that information, Mr. Miller sought to stop and prevent any further jury tampering by Mr. Cotterman. Mr. Miller asked an investigator with the State Attorney's Office "to contact officials at the Wakulla County Jail, and have [them] take away writing materials from [Mr.] Cotterman's jail cell . . . to prevent him from any further attempts at jury or witness

tampering." *Id.* Mr. Miller advises that it "was a temporary measure and was intended to prevent any further danger to the trial process until the matter could be addressed with the court." *Id.*

During this period of time, a motion had been filed to disqualify Mr. Cotterman's attorney because counsel was listed by the State as a witness to Mr. Cotterman's "attempts at suborning perjury and destroying evidence." ECF No. 125-1 at 3-4. Thus, Mr. Miller states that "as a practical matter, [Mr.] Cotterman had no attorney at that time, and any removal of his writing materials would not affect his ability to communicate with counsel." *Id.*

A hearing on the motion to disqualify counsel was held on September 11, 2014, and counsel was removed with the court appointing the public defender to represent Mr. Cotterman. *Id.* at 4. The court ordered that Mr. Cotterman "was to have no written contact with anyone other than his attorney." *Id.* Jail officials were also ordered "to confirm that any written correspondence" was "properly addressed" to Mr. Cotterman's public defender. *Id.* That requirement was added because of reports from jail staff that Mr. Cotterman's "cell contained letters labeled 'legal mail' that were in fact addressed to persons other than his current attorney, or any other attorney." *Id.*

Mr. Miller declares that he did not "instruct or advise anyone to confiscate, read or copy any legal mail found in" Mr. Cotterman's cell. *Id.* Mr. Miller states that he only "asked that any writing materials be taken away from him to prevent any further attempts at jury or witness tampering." *Id.* Those actions were taken were solely "to protect the integrity of the trial process and preserve the State's right to a fair trial." *Id.* at 5. Mr. Miller does not believe he saw "any of the items removed from" Mr. Cotterman's cell. *Id.* at 4. Furthermore, "all non-contraband items removed from" his cell were "returned to him prior to or immediately following a hearing on September 15, 2016." *Id.* at 5.

Mr. Cotterman has subsequently been criminally charged in case number 2015-CF-45, with two counts of witness tampering and one count of tampering with physical evidence. ECF No. 125-1 at 5. No charges were brought concerning jury tampering. *Id.*

Defendants provided a copy of the court order entered by Circuit Judge Dawn Caloca-Johnson on July 24, 2015. ECF No. 126-1 (Ex. 1). The order set forth findings made during "at least three proceedings" concerning Mr. Cotterman's conduct while confined in the Wakulla County Jail prior to, and during, trial. *Id.* Mr. Cotterman was found to have: (1) used the phone accounts of other inmates at the Jail "to tamper with

jurors;" (2) sent letters to jurors "claiming to be the alleged victims of the crime and offering to pay them if they found the Defendant guilty in order to be acquitted by a mistrial charged to the State." (3) passed "notes to other inmates through sugar packets or by flushing notes contained in toothpaste tubes down the toilet to adjoining cells;" (4) "attempted to suborn perjury from other inmates;" (5) destroyed evidence of such subornation of perjury in the presence of his attorney during a conference;" (6) "sent letters to witnesses attempting to influence their testimony be pretending to be his attorney."  *Id.* at 1-2.

That order detailed restrictions on the Defendant's "detention to ensure the integrity of the trial process."  *Id.* at 2.  The specified restrictions included limiting his "telephone access . . . to prevent further tampering with witnesses and jurors."  *Id.*  The judge ordered Mr. Cotterman's attorney to review his "outgoing mail to prevent further tampering with witnesses and jurors."  *Id.*  Additionally, Mr. Cotterman was to "be in confinement . . . to prevent further subornation of perjury and preventing further tampering with witnesses and jurors."  *Id.*  Judge Caloca-Johnson said that the intent of the order was "not to unreasonably restrict [Mr. Cotterman's] confinement" but to require that he "be supervised at all times regardless of his location in the jail so as to protect the integrity of the

court proceedings and trial." *Id.*  Those restrictions were imposed "in open

court in August and September, 2014[,] and February, 2015[,] based on the

evidence presented by the State . . . ." *Id.* at 2-3.

Deputy Morrison was at the courthouse when the trial judge halted

Mr. Cotterman's trial and gave the verbal order which was subsequently

reduced to writing (see Exhibit 1).  ECF No. 126-2 (Ex. 2).   Deputy

Morrison explained that the judge stated that she wanted Mr. Cotterman "to

be sequestered from all other inmates, and given no phone calls or

personal visits from outside the jail to prevent any further witness

tampering."  ECF No. 126 at 1-2.  "All contact was to be through his

attorney only."  *Id.* at 2.  Deputy Morrison prepared an email on that same

day which "passed along Judge Johnson's verbal orders . . . ."  *Id.*

Major Jackie Martin[6] is the current Facility Administrator at the Jail

and provided an affidavit in support of summary judgment.  ECF No. 126-3

(Ex. 3).  Major Martin states that "all restrictions placed upon Mr. Cotterman

[were] based upon" an understanding of the judge's order, which was to

prevent further efforts by Mr. Cotterman at witness or jury tampering.  *Id.* at

2.  Major Martin said that the only way to keep Mr. Cotterman separate

---

[6] Mr. Cotterman references Jackie Martin as having the rank of Captain.  The affidavit submitted by that Defendant reveals he holds "the rank of Major."  Ex. 3 (ECF No. 126-3).

from other general population inmates as directed by Judge Caloca-Johnson was to "house him in administrative segregation/ confinement." *Id.* at 2.  The housing restriction was "not intended as punishment" but only to "maintain institutional control and to comply with the Judge's order(s)." *Id.*

Additionally, Major Martin states that "Mr. Cotterman is currently granted access to the legal library on a regular basis."  *Id.*  "He receives indigent kits regularly, and no limits are placed on his paper usage since he is representing himself in this litigation."  *Id.*  Mr. Cotterman has been offered personal recreation time which is separate from the general population, but he "frequently declines" his opportunity for recreation.[7]  *Id.* He is "not permitted to attend general church services" but, if requested, "he would be given church services on an individual (one-on-one) basis in his cell area."  *Id.*  Mr. Cotterman has not made such a request.  *Id.*

Mr. Cotterman's commissary privileges were "initially temporarily restricted due to concerns regarding his use of commissary/canteen materials for bribing of other inmates."  ECF No. 126-3 at 3.  That status was changed on August 28, 2014, but "he had no funds in his inmate

---

[7] Attached to Major Martin's affidavit are "Day Shift Notes" which reveal that Mr. Cotterman "was offered recreation" but refused on May 28, 2015, May 27, 2015, May 22, 2015, and May 14, 2015.  ECF No. 126-3 at 6-9.

account to purchase commissary items."  In June, 2015, Mr. Cotterman began receiving some deposits in his inmate account.  *Id.*  Fifty percent of a deposit "is applied against any negative balance in the inmate's account." *Id.*  "The remainder of the deposit is allowed to be spent according to the inmate's wishes."  *Id.*

Mr. Cotterman's mail to and from his attorney (Baya Harrison) was not "screened or otherwise restricted."  ECF No. 126-3 at 3.  His personal mail was "forwarded to his attorney for screening and processing." Once counsel screened and processed it, the "mail was forwarded to Mr. Cotterman in an envelope addressed from his attorney's office."  *Id.*  All of Mr. Cotterman's outgoing mail "is solely limited to mail to his attorney, the courts, or the Wakulla County Sheriff's Office attorney, Carl R. Peterson, Jr., pursuant to Judge Johnson's orders."  ECF No. 126-3 at 3. Those mail procedures have "been in place since shortly after his criminal trial was halted on August 28, 2014."  *Id.* at 3-4.

Additionally, Mr. Cotterman is "permitted to use the telephone, <u>if he has had funds available and has purchased phone minutes from his inmate account</u>."  *Id.* at 4 (emphasis in original).  Otherwise, all phone calls are limited to those to/from his attorney.  He has also "not been permitted to have unfettered or unlimited general visitation."  *Id.*  "After a request,

however, he was allowed to have visitation with his sister." *Id.* "Any future requests for visitation will be handled by a case-by-case basis, given his court-imposed security restrictions." *Id.*

Finally, Major Martin declares that he was not present and has no personal knowledge of jail staff's "temporary removal of Mr. Cotterman's personal property from his jail cell on September 11, 2014." *Id.*

Sheriff Charlie Creel submitted an affidavit advising that he received an email from Deputy Morrison concerning Judge Caloca-Johnson's orders. ECF No. 126-4 (Ex. 4). Sheriff Creel declares that he did not directly communicate with the judge, but he did "send her a letter advising her of plans to allow regular visitation, subject to security monitoring; and, to allow regular telephone access effective August 6, 2015." *Id.* at 1-2; *see also* ECF No. 126-4 (Ex. A). He "issued no instructions to any correctional personnel related to Mr. Cotterman." *Id.* at 2. He advises that Jail staff "are expected to follow Judge Caloca-Johnson's orders concerning [Mr. Cotterman's] security restrictions." *Id.* at 2.

Major Jared Miller is the former Jail Administrator, having worked in that capacity from 2004 until February 2016. ECF No. 126-5 (Ex. 5). He states that he had no direct communication with the trial judge, but is aware of communications between Major Morrison and Captain Martin following

Judge Caloca-Johnson's halting of Mr. Cotterman's criminal trial.  *Id.*  He declares that he "had no personal knowledge or involvement in any of the underlying incidents" alleged by Mr. Cotterman in his complaint.  *Id.* at 2. He further states that he did not issue any instructions to any jail staff concerning Mr. Cotterman.  *Id.*  He advises that staff are expected to follow Judge Caloca-Johnson's orders concerning his security restrictions.  *Id.*

An additional affidavit from Marlene Sanders advises that inmates with funds in their inmate trust accounts can "purchase canteen/ commissary items by making a request if [the] inmate is not housed in general population."  ECF No. 126-6 (Ex. 6).  She has provided Mr. Cotterman's account which reveals two deposits were made prior to August 28, 2014.  *Id.* at 2.  Mr. Cotterman purchased $39.76 of items in the canteen and transferred $6.99 to purchase phone minutes.  *Id.*  The next deposit in his account was on June 14, 2015.  He purchased $37.24 of items in the canteen.  When Mr. Cotterman received another $40.00 deposit on August 30, 2015, he received half pursuant to the Sheriff's policy and "immediately purchased $19.93 worth of various commissary items."  *Id.*  Ms. Sanders declares that Mr. Cotterman has subsequently been able to purchase canteen items and purchase phone minutes.  *Id.* at 2-3.

An additional affidavit was filed by Stephanie Gaines who worked at the jail as a licensed practical nurse.  ECF No. 126-8 (Ex. 8).  She states that on August 29, 2014, Mr. Cotterman was brought to medical by two officers, one of whom was correctional officer Jeff Carroll.[8]  *Id.*  Mr. Cotterman "had a small laceration on the top left of his head."  *Id.*  Mr. Cotterman "refused to answer any of" Nurse Gaines' questions about the cause of the laceration.  *Id.*  Nurse Gaines "cleaned the wound and applied antibiotic ointment to it."  *Id.* at 2.  She states that it "did not appear to be significant enough to need any stitches or any further treatment."  *Id.*  She advises that she gave Mr. Cotterman the treatment she "thought was indicated, and at no time did any correctional officer give [her] any instructions or attempt to hinder [her] in providing medical care to Mr. Cotterman."  *Id.*  She offered him pain medication and ice, which he declined.  *Id.*  He was then kept "in a holding cell for observation for a period of time."  *Id.*  Nurse Gaines checked on him a couple of times, but he "showed no signs of distress or needing further medical treatment."  *Id.*

---

[8] A "Jail Incident Report" was submitted which was completed by Officer Julie Martin, dated August 30, 2014.  ECF No. 126-9 at 4.  It states that after "Lt. Martin heard something hitting the wall in SC/E," Officer Martin opened the window from her station and saw Mr. "Cotterman standing near the shower looking away from" her.  *Id.*  She "noticed blood on top of his head and his left hand."  *Id.*  Officer Martin called for officers to take Mr. Cotterman to the medical department.  *Id.*

The following morning, August 30, 2014, Mr. Cotterman was moved back to his cell.  *Id.*

Defendants' final affidavit is from Officer Jeff Carroll who advises that he had been summoned by Lieutenant Martin, the shift supervisor, to take Mr. Cotterman to the nurse for "evaluation of a small cut to his head."  ECF No. 126-9 at 1 (Ex. 9).  Officer Carroll, along with DD Delbeato, escorted Mr. Cotterman to Nurse Gaines.  *Id.*  Officer Carroll states that Mr. Cotterman "was not very cooperative," but Nurse Gaines cleaned the small wound and applied an ointment.  Officer Carroll "relied on Nurse Gaines to make all health care decisions and did not attempt to influence her in any way."  *Id.*

Officer Carroll further declares that on September 11, 2014, the toilet in the confinement cell shared by Mr. Cotterman and another inmate "was stopped up and overflowing."  ECF No. 126-9 at 2.  Officer Carroll says the toilet "appeared to have been stopped up on purpose."  *Id.*  He offered cleaning supplies (mop, bucket, and cleaning chemicals) to Mr. Cotterman, "but he wanted [Officer Carroll] to clean up the mess for him."  *Id.*  Officer Carroll did not do so and told Mr. Cotterman "that when he changed his attitude, the cleaning supplies would be available."  *Id.*

Officer Carroll indicates that on another occasion in September 2014, he was "distributing indigent kits (writing materials, envelopes, etc.) to inmates."  ECF No. 126-9 at 2.  "For some reason, there was no kit identified for [Mr. Cotterman] on [that] one occasion, and" Officer Carroll told Mr. Cotterman "it must have been lost."  *Id.*  Officer Carroll could not give Mr. Cotterman "an indigent kit that had not been provided to [him] from the commissary system."  *Id.*

Mr. Cotterman provided a copy of the transcript of the August 28, 2014, hearing as evidence.  ECF No. 132 at 20-47 (Plaintiff's Ex. A).  The transcript reflects that recorded jail phone calls were played for the Court which resulted in the dismissal of a juror.  *Id.* at 23-41.  Judge Caloca-Johnson granted a continuance and set trial to resume on September 17, 2014.  *Id.* at 42-46.  The trial judge stated on the record: "Mr. Cotterman can have contact with his attorney."  *Id.* at 45.  However, she suspended his phone privileges and told him, "You are not allowed to talk to anybody until we finish this trial."  *Id.*

A subsequent hearing was held on September 15, 2014, and Mr. Cotterman provided that transcript as well.  ECF No. 132 at 49-59.  The transcript confirms that another hearing had been held between the August 28th hearing and the September 15th hearing during which an attorney

from the Office of Regional Conflict Counsel was appointed to represent

Mr. Cotterman due to a conflict with the Public Defender's Office.  *Id.* at 50.

In light of that change, Mr. Cotterman, through counsel, requested a

continuance of the trial.  *Id.* at 50-51.   Mr. Cotterman then raised a

question "regarding certain restrictions at the jail."  *Id.* at 53.  Judge Caloca-

Johnson made the following clarification:

> I'll make it clear, again, from what I said last Thursday.  He
> [Mr. Cotterman] is absolutely allowed to write to his attorney,
> and visit with you.  I said that last Friday.  What I said was, that
> any communications, because he does have obviously, a right
> to confer with his attorney.  What I said was, any
> communications had to be addressed to his attorney, and that
> somebody needed to verify that whatever was in that envelope
> – not read what's in the envelope, but the address, is your
> address.

ECF No. 132 at 54.   She added that Mr. Cotterman could not "send

correspondence to anybody else but" his attorney.  *Id.*  "If there's someone

else he wants to send something to, he can ask you Mr. Higgins, and we

can make arrangements."  *Id.*  The judge also said:

> The problem is, based on what's happened in this case is, I'm
> not allowing him correspondence with other folks.  Now if
> there's a deposition transcript that he needs to read, I don't
> have a problem with him assisting in his preparation in his
> defense for trial.  What I have a problem with at this point is,
> communications with other folks other than yourself.

*Id.* at 55.  Mr. Cotterman, through counsel, indicated that he was "worried about any past correspondence from attorneys, that may have been taken away from him.  In other words, discovery, notes, et cetera."  *Id.*  Judge Caloca-Johnson sought to find out what had been taken away, *Id.* at 55, to which Mr. Miller, the prosecutor advised:

> And to clarify, Judge, as soon as we were aware last week that he was writing to the jurors, we did request the jail to administratively take those away from him, temporarily.  But I have no – obviously, no objection to him communicating with his lawyer, at this point in time.  Just at that time he didn't really have a lawyer, so there was no reason for him to write to anyone during that time period.  Now that Mr. Higgins is his attorney on this case, I of course, have no objection to him communicating only with Mr. Higgins.

ECF No. 143 at 56-57.  The trial judge made clear that Mr. Cotterman was "absolutely allowed to assist in preparation of his defense" and to have written and telephonic communication with counsel.  *Id.* at 57.

Mr. Cotterman also submitted a prior affidavit by Captain Jackie Martin who advised that all restrictions placed on Mr. Cotterman were "based upon the Wakulla County Detention Facility/Jail's understanding of instructions/restrictions received from Judge Dawn Caloca-Johnson." ECF No. 132 at 131.  Captain Martin stated his understanding that the restrictions "are aimed at preventing further witness or jury tampering by Mr. Cotterman so that a fair trial can be accomplished."  *Id.*  That affidavit

declared that Mr. Cotterman was regularly granted access to the legal library, "receives indigent kits regularly, and no limits [were] placed on his paper usage since he is representing himself in this litigation." *Id.* His personal recreation time is separate from other inmates and his commissary privileges were "restricted due to concerns regarding his use of commissary materials for bribing of other inmates." *Id.* "Mr. Cotterman's mail to and from his attorney [was] not being screened or otherwise restricted" but his "other mail has been restricted by Judge Caloca-Johnson due to prior apparent jury and witness tampering by Mr. Cotterman that interfered with and stopped his earlier criminal trial." *Id.*

Mr. Cotterman also provided his own affidavit as evidence. ECF No. 132 at 133-136. He declares that he was placed in confinement on August 28, 2014. *Id.* at 133. On that date, he had "all privileges taken" away and was not allowed "exercise, t.v., commissary . . . water cooler, church," and no visits, phone calls, or mail except with his attorney. *Id.* He states that his security level was raised from a level 2 to level 3 and he was told the reason was because of the nature of his charges. *Id.* He also declares that Deputy Carroll "forced" him and his cellmate, Anthony Cannon, to "sit in urine and fecies [sic] for hours." *Id.* *Id.* at 133-134.

Mr. Cotterman said he was not given personal mail for over a year. ECF No. 132 at 134.  He declares that after he had a seizure, Deputy Carroll placed him in a suicide suit and put him in a holding cell for observation.  *Id.*  On one occasion, Deputy Carroll passed out commissary but did not give an indigent kit to Mr. Cotterman, advising that it was lost. *Id.*  Mr. Cotterman declares that he was denied "exercise" for 147 days.  *Id.* He contends that denial was not court ordered.  *Id.*  He also declares that he is being denied a t.v. even though other inmates held in administrative segregation "retain all privileges . . . ."  *Id.* at 134-135.

**Analysis**

**1.    Count 2 - First Amendment Claim against Mr. Miller**

The only claim remaining against Mr. Miller is a First Amendment freedom of speech claim.  It is based on Mr. Cotterman's allegation that on September 11, 2014, Mr. Miller had officials at the Jail go into his confinement cell, take all his "legal material," all mail, and writing paper, and "go through it, make copies and give the copies to Prosecutor Miller."

"[M]ail is a medium of free speech, 'and the right to send and receive mail exists under the First Amendment.'"  Al–Amin v. Smith, 511 F.3d 1317, 1333 (11th Cir. 2008).  Opening and reading a pre-trial detainee's legal mail outside his presence is a First Amendment violation.  Ford v. Hunter,

534 F. App'x 821 (11th Cir. 2013).  Here, however, Mr. Cotterman has

provided no evidence in support of this claim.  The undisputed evidence is

that in an effort to prevent jury tampering, Mr. Miller asked, through his

investigator, for jail officials to "take away writing materials from" Mr.

Cotterman's cell.  It may be inferred that all of Mr. Cotterman's property

was removed from the cell and searched.  Yet no evidence has been

presented with demonstrates that Mr. Miller, or any other named

Defendant, read Mr. Cotterman's legal mail or other "legal" materials.

"Lawful incarceration brings about the necessary withdrawal or

limitation of many privileges and rights, a retraction justified by the

considerations underlying our penal system."  Bell v. Wolfish, 441 U.S. 520,

545–46, 99 S. Ct. 1861, 1877–78, 60 L. Ed. 2d 447 (1979) (quoting Price v.

Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

That "principle applies equally to pretrial detainees and convicted

prisoners.  A detainee simply does not possess the full range of freedoms

of an unincarcerated individual."  Wolfish, 441 U.S. at 546, 99 S. Ct. at

1878.  Thus, jail officials can search the cells of pretrial detainees and

impose restrictions on liberty interests which are reasonably related to a

legitimate governmental objective.  441 U.S. at 539, 99 S.Ct. at 1874

(concluding that "if a particular condition or restriction of pretrial detention is

reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"); Block v. Rutherford, 468 U.S. 576, 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984) (reaffirming Wolfish and the "wide-ranging deference" which must be given to the authorities charged with running correctional facilities).  Ensuring that a criminal defendant cannot engage in jury and witness tampering is a legitimate governmental objective.  Based on the reports of inmates at the jail who alerted jail officials to notes being sent to them by Mr. Cotterman, the removal and search of items in his cell was appropriate.

Furthermore, the deprivation of Mr. Cotterman's property was for a limited duration.  Mr. Miller's affidavit demonstrates that the non-contraband items taken from Mr. Cotterman's cell were held for no more than a week and then returned.  Mr. Cotterman has not disputed that his property was not returned to him within, approximately, one week.  There is also no evidence that during this week Mr. Cotterman was denied the ability to communicate with counsel and assist with his defense.  There is no evidence that Mr. Miller prevented Mr. Cotterman from making a telephone call or writing a letter.  It is true that at a court hearing in September 2014, Mr. Cotterman was ordered "to have no written contact with anyone other than his attorney."  Yet Mr. Miller is not responsible for

that limitation which was imposed because of Mr. Cotterman's alleged activities which, if true, would undermine a fair jury trial. Summary judgment should be granted in favor of Mr. Miller on the First Amendment claim.

## 2.    Count 1 - Due Process Violation

Plaintiff alleged that Sheriff Creel, Major Miller, Deputy Morrison, and Captain Martin placed him in administrative segregation and took away his privileges without due process of law. ECF No. 38 at 6-9. He alleged that Defendants were "illegally punishing" by taking away "all" of his privileges and constitutional rights. *Id.* at 6.

Defendants contend that they are entitled to absolute judicial immunity because the restrictions imposed on Mr. Cotterman were pursuant to a court order. ECF No. 126 at 9-14. Mr. Cotterman does not dispute that defense. *See* ECF No. 132.

"Absolute quasi-judicial immunity derives from absolute judicial immunity." Roland v. Phillips, 19 F.3d 552, 555 (11th Cir. 1994) (citing Turney v. O'Toole, 898 F.2d 1470, 1474 (10th Cir. 1990)). "Judges are absolutely immune from civil liability under section 1983 for acts performed in their judicial capacity" and, as an extension, "[n]onjudicial officials are encompassed by a judge's absolute immunity when their official duties

"have an integral relationship with the judicial process." Roland, 19 F.3d at 555 (quoting Ashbrook v. Hoffman, 617 F.2d 474, 476 (7th Cir. 1980)). "Enforcing a court order or judgment is intrinsically associated with a judicial proceeding." 19 F.3d at 555 (quoting Valdez v. Denver, 878 F.2d 1285, 1288 (10th Cir. 1989)). Immunizing persons who execute court orders is essential because those individuals "are themselves 'integral parts of the judicial process.'" Coverdell v. Dep't of Soc. & Health Servs., State of Wash., 834 F.2d 758, 765 (9th Cir. 1987) (quoting Briscoe v. LaHue, 460 U.S. 325, 335, 103 S.Ct. 1108, 1116, 75 L.Ed.2d 96 (1983) (quoted in Roland, 19 F.3d at 555)). "Law enforcement officials 'must not be called upon to answer for the legality of decisions which they are powerless to control' or 'be required to act as pseudo-appellate courts scrutinizing the orders of judges.'" Valdez, 878 F.2d at 1289 (quoted in Roland, 19 F.3d at 556). The Eleventh Circuit in Roland v. Phillips held that "law enforcement personnel, acting in furtherance of their official duties and relying on a facially valid court order, are entitled to absolute quasi-judicial immunity from suit in a section 1983 action." 19 F.3d at 556.

Here, it is undisputed that Judge Caloca-Johnson issued verbal orders in three court proceedings. Mr. Cotterman provided transcripts of the first and third of those proceedings, but not the second. The judge also

entered a written order memorializing the verbal orders given.  The orders were entered within Judge Caloca-Johnson's judicial capacity in presiding over Mr. Cotterman's criminal trial. "Whether a valid judicial order is verbal or written, an executing law enforcement official is protected by absolute quasi-judicial immunity."  <u>Roland</u>, 19 F.3d at 557 (citing <u>Valdez</u>, 878 F.2d at 1286).

Mr. Cotterman challenges whether or not all actions taken by officials were pursuant to the trial court's order.  ECF No. 132.  He first contends that increasing his security level to "maximum security" was not pursuant to the order.  *Id.* at 1.  It does not appear that such an increase was mandated by the order.  Notwithstanding, Mr. Cotterman does not have a protected liberty interest in the security rating assigned to him at the jail.  That is a matter of institutional security and is left to officials at the jail to make such determinations.  <u>Wolfish</u>, 441 U.S. at 540, 99 S. Ct. at 1875 (recognizing "that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.").  A detainee's security rating appropriately

considers the nature of criminal charges, institutional adjustment, subversion of rules, and the like.

Furthermore, the decision to use handcuffs and leg shackles when being transported is a discretionary decision based on a detainee's security level. Such a decision is not a protected liberty interest. There is no evidence that Mr. Cotterman was handcuffed other than for transport and movement outside his cell. Doing so is a valid security measure and does not violate his constitutional rights and is not punishment.

Mr. Cotterman challenges the limitations placed on his mail and visitation privileges. He was able to send and receive legal mail, but his personal mail was required to be sent to his attorney for clearance. Such restrictions implicate the First Amendment, but the denials were based on the trial court's order. Thus, because his restrictions were in compliance with Judge Caloca-Johnson's order, Defendants are entitled to absolute quasi-judicial immunity. Although Mr. Cotterman's makes an issue of the timing of the written order, *see* ECF No. 132 at 2, it is undisputed that a verbal order was made by the trial judge prior to the imposed restrictions.

Mr. Cotterman challenges that the "only order" placed on the record by the trial judge was to restrict his telephone use. ECF No. 132 at 1. That is not correct. In the first hearing held on August 28, 2014, recorded jail

phone calls were played and Judge Caloca-Johnson suspended his telephone privileges. However, another hearing was held on September 15, 2014, and it was during that hearing that the judge confirmed rulings made in an interim hearing held between August 28th and September 15th. That second transcript provides evidence that Mr. Cotterman's mail was also restricted, as were visits. The judge entered a written order directing that Mr. Cotterman was to "be in confinement . . . to prevent further subornation of perjury and preventing further tampering with witnesses and jurors." *Id.* In implementing that portion of the order, jail officials determined that he would not be permitted recreation time with other inmates to prevent subornation of perjury. Similarly, Mr. Cotterman was not permitted to attend "general church services," although the undisputed evidence is that he could have an individual religious service in his cell, but Mr. Cotterman never made such a request. Nevertheless, Mr. Cotterman was not completely isolated as the evidence reveals that at times, he had a cell mate. Those restrictions were within the parameters of Judge Caloca-Johnson's order for confinement, and Defendants are entitled to absolute quasi-judicial immunity.

Mr. Cotterman also challenges the loss of several other privileges which have not been shown to be pursuant to the judge's order. As for the

inability to purchase items from the canteen or commissary, the undisputed evidence is that Mr. Cotterman was unable to purchase items from the canteen because of a lack of funds.  Defendants demonstrated that Mr. Cotterman was able to make purchases when funds existed in his account, which was before August 28, 2014, and then not until June 14, 2015.  When a deposit was made, Mr. Cotterman purchased items in the canteen.  He received another deposit in August 2015 and, again, purchased commissary items.  Mr. Cotterman has not shown a specific time period in which he had funds in his account in which a Defendant did not permit him to purchase items from the canteen.

As for the claim that Mr. Cotterman was denied "t.v." and "water cooler," that claim is insufficient to proceed.  "[I]nmates do not have a constitutional right to watch television."  Poulin v. Jeter, No. 608-CV-299-ORL-31KRS, 2010 WL 3701384, at *8 (M.D. Fla. Sept. 15, 2010) (citing Taylor v. Franklin, case no. 2:09–cv–06–ID, 2010 WL 432195, at *1 (M.D.Ala. Feb. 3, 2010) (citing Scheanette v. Dretke, case no. 05–41628, 2006 WL 2474486, at *1 (5th Cir. Aug. 28, 2006) and Elliott v. Brooks, case nos. 98–1470 and 98–8032, 1999 WL 535909, at *1 (10th Cir. July 20, 1999))); see also Murphy v. Walker, 51 F.3d 714, 718, n.8 (7th Cir.1995) (finding no constitutional violation in prisoner's claim that he was denied

television).  Nevertheless, Mr. Cotterman is not a convicted prisoner but a

pretrial detainee.  Mr. Cotterman's affidavit stated that inmates in

administrative segregation "are to retain all privileges and t.v. is a

privilege."  ECF No. 132 at 124-135.  He stated that for a portion of time he

had a t.v. in his cell, but when he was "moved" on February 14, 2016, he

said he was "now being denied a t.v. once again . . . ."  Construing this

claim liberally and in the light most favorable to Mr. Cotterman, if he "was

denied television privileges, which other inmates shared, for discriminatory

reasons, then he has an equal protection claim."  *See* Miller v. Trometter,

No. 4:11-CV-811, 2012 WL 5933015, at *5 (M.D. Pa. Nov. 27, 2012) (and

cases cited therein).  Yet the deficiency here is that Mr. Cotterman provides

no evidence of any specific Defendant denying him television privileges.

Moreover, that denial was in February 2016, well after this case was filed in

2014.  As for the claim for "no water cooler," this claim is vague and

conclusory.  It also must fail for lack of sufficient evidence connecting any

specific Defendant to denying Mr. Cotterman a "water cooler."   Summary

judgment should be granted in favor of all Defendants on Count 1 of the

complaint.

### 3.      Count 3 - Deputy Carroll's denial of proper medical treatment

Prisoners and pretrial detainees have a constitutional guarantee that they will not be "deprive[d] ... of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)).  Those "[b]asic human necessities include food, clothing, shelter, sanitation, medical care, and personal safety." Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991) (cited in Collins v. Homestead Corr. Inst., 452 F.App'x 848, 850-851 (11th Cir. 2011)).

Here, there is no evidence that Deputy Carroll denied Mr. Cotterman necessary medical care.  The undisputed evidence is that Deputy Carroll took him to the medical department and a nurse treated his wound.  There is no evidence that Deputy Carroll prevented Mr. Cotterman from receiving treatment.  Mr. Cotterman said in his affidavit that he was "forced" into a "suicide suit" and put in a cell for observation.  Considering Mr. Cotterman injured his head and had been bleeding, that would be appropriate care, not insufficient care.  Deputy Carroll should be granted summary judgment on this claim.

**4.     Count 4 - Retaliation by Deputy Carroll**

Mr. Cotterman claimed that Deputy Carroll retaliated against him by failing to provide him an "indigent kit."  No evidence was brought forward by Mr. Cotterman to support that claim.  The undisputed evidence is that on one occasion in September 2014, he was "distributing indigent kits (writing materials, envelopes, etc.) to inmates."  ECF No. 126-9 at 2.  No kit was included for Mr. Cotterman and Officer Carroll said, "it must have been lost."  *Id.*  There is no evidence that Officer Carroll intentionally failed to give Mr. Cotterman an indigent kit and there is no evidence of retaliation. Summary judgment should be granted in favor of Deputy Carroll on this claim as well.

**5.     Count 5 - Deputy Carroll forced Plaintiff "to sit in unsanitary conditions for several hours."**

Mr. Cotterman submitted evidence that he and his cellmate, Anthony Cannon, were "forced" to "sit in urine and fecies [sic] for hours."  Deputy Carroll's evidence is that after the toilet in Mr. Cotterman's cell was apparently intentionally "stopped up," cleaning supplies were offered to Mr. Cotterman.  The supplies included a mop, bucket, and cleaning chemicals.   Mr. Cotterman, however, wanted Officer Carroll to clean up the mess in his cell.  Officer Carroll is not required to clean Mr. Cotterman's cell

and the fact that he did not do so does not violate Mr. Cotterman's rights. The undisputed evidence here reveals that Mr. Cotterman stayed in unsanitary conditions because he refused to clean his own cell.  Summary judgment should be granted in favor of Deputy Carroll on this claim as well.

## RECOMMENDATION

It is respectfully **RECOMMENDED** that Defendant Brian Miller's motion for summary judgment, ECF No. 124, be **GRANTED** and judgment entered in his favor.  It is further **RECOMMENDED** that the summary judgment motion filed by Defendants Jeff Carroll, Charlie Creel, Jackie Martin, Jared Miller, and Clarence Trey Morrison, ECF No. 126, be **GRANTED** and judgment entered in Defendants' favor on all claims.

**IN CHAMBERS** at Tallahassee, Florida, on February 1, 2017.


 S/     Charles A. Stampelos
**CHARLES A. STAMPELOS
UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u> If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.